******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CHRISTOPHER BARKER *v.* ALL ROOFS BY DOMINIC ET AL.
## (SC 20196)

Robinson, C. J., and Palmer, McDonald, Kahn,
Ecker, Vertefeuille and Elgo, Js.*

### *Syllabus*

Pursuant to a provision of the Workers' Compensation Act (§ 31-291), "[w]hen any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation . . . to the same extent as if the work were done without the intervention of such contractor or subcontractor."

The defendants city of Bridgeport and its insurer, P Co., appealed from the decision of the Compensation Review Board, which affirmed the decision of the Workers' Compensation Commissioner, who had found that the city was the plaintiff's principal employer and, therefore, liable for the plaintiff's workers' compensation benefits. The plaintiff had been employed by H Co., an uninsured subcontractor of the city, when he was injured while doing repair work to the roof of the city's transfer facility. The plaintiff sought workers' compensation benefits, and, following a hearing, the commissioner found that, because he was an employee of an uninsured subcontractor when he suffered his compensable injury, the Second Injury Fund was statutorily (§ 31-355) required to pay his workers' compensation benefits. The Second Injury Fund subsequently contested liability on the ground that, pursuant to § 31-291, the city was the plaintiff's principal employer when he suffered his injury and, therefore, was required to pay the workers' compensation benefits owed to him. Following additional hearings, the commissioner determined that, under *Massolini* v. *Driscoll* (114 Conn. 546), a municipality can be held liable as a principal employer under § 31-291, that the city had a statutory (§ 7-148) duty to manage, maintain, and repair its property, including the transfer facility, and that repairing the transfer facility's roof was a part or process in the city's trade or business within the meaning of § 31-291. Accordingly, the commissioner found that the city was the plaintiff's principal employer and ordered the city and P Co. to pay his workers' compensation benefits. The city and P Co. appealed to the board, which affirmed the commissioner's decision. Thereafter, the city and P Co. appealed to the Appellate Court, which upheld the board's decision. On the granting of certification, the city and P Co. appealed to this court. *Held* that the Appellate Court correctly concluded that, under § 31-291, the city was liable as the plaintiff's principal employer for workers' compensation benefits to which he was entitled as a result of the injuries he sustained repairing the roof of the city's transfer facility while employed by the city's uninsured subcontractor: whether an uninsured contractor's or subcontractor's work is a part or process in the trade or business of the principal employer under § 31-291 is a fact specific determination to be made in light of certain nondispositive factors, including the employer's legally defined powers and obligations, the complexity of the work being performed and the degree of specialization required, whether the employer supplied the tools or materials or oversaw the work, and whether the work was of such a character that it ordinarily would be performed by the employer's own employees or was an otherwise essential part in the maintenance or operation of the employer's business; considering the relevant factors in light of the record, as well as § 31-291's broader remedial purpose of preventing employers from denying workers full protection under the workers' compensation scheme by simply hiring uninsured contractors or subcontractors, this court concluded that the commissioner reasonably determined that the repair of the transfer facility's roof was a part or process in the city's trade or business, as it was undisputed that the city was responsible pursuant to § 7-148 to maintain and repair its public

buildings, the roof repairs at issue were not especially complex and did not demand specialized skills, and, although the city did not employ its own roofers for financial reasons despite employing a variety of other tradespeople to maintain and repair city property, the roof repair fell within the nature and scope of the maintenance and repair work ordinarily performed by city employees; moreover, this court declined the city and P Co.'s invitation to overrule *Massolini* insofar as it applies principal employer liability to municipalities, as that case's holding has, over the past eighty years, become embedded in Connecticut worker's compensation law, and the city and P Co. did not identify any ambiguity in the statutory scheme or any legislative history suggesting that the legislature intended to abrogate this court's holding in *Massolini* or to change the standards of principal employer liability through the creation of the Second Injury Fund, a primary purpose of which is, instead, to act as a payer of last resort when an employer is unable to pay.

(*Three justices dissenting in one opinion*)

Argued October 22, 2019—officially released August 13, 2020**

*Procedural History*

Appeal from the decision of the Workers' Compensation Commissioner for the Third District determining that the defendant city of Bridgeport was the plaintiff's principal employer, brought to the Compensation Review Board, which affirmed the commissioner's decision; thereafter, the defendant city of Bridgeport et al. appealed to the Appellate Court, *Sheldon*, *Bright* and *Harper*, *Js.*, which affirmed the board's decision, and the defendant city of Bridgeport et al., on the granting of certification, appealed to this court. *Affirmed.*

*Joseph J. Passaretti*, *Jr.*, with whom, on the brief, was *Amanda A. Hakala*, for the appellants (defendant city of Bridgeport et al.).

*Lisa Guttenberg Weiss*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Philip M. Schulz*, assistant attorney general, for the appellee (Second Injury Fund).

*Opinion*

ECKER, J. The sole issue in this certified appeal is whether, under the Workers' Compensation Act, General Statutes § 31-291,[1] a municipality is the "principal employer" of an employee of an uninsured roofing subcontractor injured while repairing a municipal building. The defendants city of Bridgeport (city) and PMA Insurance Company[2] contend that the city is not a principal employer under the statute because it is not in the "trade or business" of roof repair. The Second Injury Fund (fund) responds that the city is in the "trade or business" of maintaining and repairing municipal buildings and facilities, and, therefore, the Appellate Court properly affirmed the judgment of the Compensation Review Board (board), which found that the city was liable for the payment of the workers' compensation benefits of the plaintiff, Christopher Barker, as his principal employer. We agree with the fund and affirm the judgment of the Appellate Court.

The relevant facts and procedural history are not in dispute. In March, 2000, the city hired the defendant All Roofs by Dominic (All Roofs) to do repair work on the roof of the city's transfer facility located at 475 Asylum Street. All Roofs hired the defendant Howard Adams d/b/a Howie's Roofing (Howie's Roofing) as a subcontractor. On June 29, 2000, the plaintiff, an employee of Howie's Roofing, was injured in the course and scope of his employment when he fell from the roof under repair. After his fall, the plaintiff sought workers' compensation benefits from Howie's Roofing, All Roofs, and the city. Neither Howie's Roofing nor All Roofs carried a valid workers' compensation insurance policy.

A formal hearing was held before the Workers' Compensation Commission. On January 5, 2005, the Workers' Compensation Commissioner for the Fourth District determined that the plaintiff was an employee of Howie's Roofing when he suffered his work-related injury. Because Howie's Roofing was uninsured, that finding required the fund to pay the workers' compensation benefits owed to the plaintiff pursuant to General Statutes § 31-355.[3] The fund subsequently contested liability on the ground that, under § 31-291, the city was the principal employer of the plaintiff and, therefore, was required to pay the workers' compensation benefits owed to him.

Additional hearings were conducted before the Workers' Compensation Commission on November 19, 2015, and February 23, 2016, to determine the city's principal employer liability. The city conceded that it had hired All Roofs to perform work on the transfer facility and that the plaintiff's injury took place on municipal property under the city's control. The city denied, however, that the roofing work performed by All Roofs was a part or process in the city's trade or business, which

is a prerequisite to establish principal employer liability under § 31-291. John F. Cottell, Jr., Deputy Director of Public Facilities for the city, testified that it was the responsibility of the public facilities department to maintain city-owned buildings, but he also testified that the city did not employ a roofer because the need was not extensive enough to justify the cost of employing one on a full-time basis.

In his written finding and orders, the Workers' Compensation Commissioner for the Third District (commissioner) determined that, under *Massolini* v. *Driscoll*, 114 Conn. 546, 551–52, 159 A. 480 (1932), a municipality can be liable as a principal employer under § 31-291. The commissioner also determined that, pursuant to General Statutes § 7-148,[4] the city has a statutory duty to manage, maintain, repair, and control its property, including its transfer facility. In addition, the commissioner concluded that the work of repairing the roof of the transfer facility was a part or process in the city's trade or business. The commissioner found that the city was the plaintiff's principal employer and ordered the defendants to pay the workers' compensation benefits to which the plaintiff was entitled. The defendants filed a motion to correct and a motion for articulation, both of which the commissioner denied.

The defendants appealed to the board, which affirmed the commissioner's decision. The defendants timely appealed from the board's decision to the Appellate Court. The Appellate Court affirmed the decision of the board. *Barker* v. *All Roofs by Dominic*, 183 Conn. App. 612, 623, 193 A.3d 693 (2018). We granted the defendants' petition for certification to appeal, limited to the following issue: "Did the Appellate Court [correctly] conclude that, under . . . § 31-291, as construed by *Massolini* v. *Driscoll*, [supra, 114 Conn. 546], the . . . city . . . was liable for workers' compensation benefits as the principal employer of a worker hired by an uninsured subcontractor to repair the roof of a building owned by the city?" *Barker* v. *All Roofs by Dominic*, 330 Conn. 925, 926, 194 A.3d 292 (2018).

The defendants contend that roof repair is not a part or process in the city's trade or business under § 31-291, as construed by *Massolini*. Alternatively, the defendants argue that *Massolini* is no longer good law because (1) it utilizes an outdated definition of "business" under the principal employer statute, and (2) the subsequent creation of the fund has "displaced" *Massolini* by providing a "logical alternative" to the holding in that case. Lastly, the defendants argue that the imposition of principal employer liability against a municipality violates General Statutes § 31-286a (c).[5] In response, the fund argues that (1) *Massolini* remains controlling law, notwithstanding the subsequent creation of the fund, (2) pursuant to § 31-291, as construed by *Massolini*, the city is liable for the payment of workers' com-

pensation benefits to the plaintiff as his principal employer, and (3) § 31-286a (c) has no application on this record.

Our standard of review applicable to workers' compensation appeals is well-settled. "The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and [the] board." (Internal quotation marks omitted.) *Marandino* v. *Prometheus Pharmacy*, 294 Conn. 564, 572, 986 A.2d 1023 (2010). "Our Workers' Compensation Act indisputably is a remedial statute that should be construed generously to accomplish its purpose." *Driscoll* v. *General Nutrition Corp.*, 252 Conn. 215, 220, 752 A.2d 1069 (2000).

The principal employer statute provides in relevant part: "When any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation under this chapter to the same extent as if the work were done without the intervention of such contractor or subcontractor. . . ." General Statutes § 31-291. The "underlying purpose" of the statute is to impose liability in "those situations [in which injurious] conditions might be assumed to be largely within the control or observation of the principal employer." *Wilson* v. *Largay Brewing Co.*, 125 Conn. 109, 112, 3 A.2d 668 (1939). Because "[m]ost compensable injuries are due to conditions of employment the danger from which could be prevented or minimized by sufficient oversight or control"; id.; the statute provides an incentive for the principal employer to provide a safe working environment for the contractors and subcontractors that carry out any part or process in its trade or business. See *Sgueglia* v. *Milne Construction Co.*, 212 Conn. 427, 433, 562 A.2d 505 (1989) ("[t]he purpose of § 31-291 is to protect employees of minor contractors against the possible irresponsibility of their immediate employers, by making the principal employer who has general control of the business in hand liable as if he had directly employed all who work [in] any part of the business [that] he has undertaken to carry on" (internal quotation marks omitted)); *Johnson* v. *Mortenson*, 110 Conn. 221, 225, 147 A. 705 (1929) (principal employer statute "afford[s] full protection to work[ers], by preventing the possibility of defeating the [Workers' Compensation Act] by hiring irresponsible contractors or subcontractors to carry on a part of the employer's work").

The relevant portion of the principal employer statute has remained unchanged since the enactment of our original Workers' Compensation Act in 1913. See Public Acts 1913, c. 138, pt. B, § 5. The controlling decisional law is similarly long-standing. Since 1927, we consistently have applied a three-part test to determine principal employer liability under the Workers' Compensation Act. "To render a principal employer liable, it is clear [that] this statute requires (1) that the relation of principal employer and contractor must exist in work wholly or in part for the former, (2) that the work must be in, on or about premises controlled by the principal employer, and (3) that the work be a part or process in the trade or business of the principal employer." *Crane* v. *Peach Bros.*, 106 Conn. 110, 113, 137 A. 15 (1927). The third prong of this test—the only one at issue in the present case—frequently is the most difficult to apply. See, e.g., *Fox* v. *Fafnir Bearing Co.*, 107 Conn. 189, 192–95, 139 A. 778 (1928). The question of whether the work at issue is included within an employer's trade or business largely is one "of degree and fact." *Grenier* v. *Grenier*, 138 Conn. 569, 571, 87 A.2d 148 (1952). Fortunately, however, our precedent supplies "a number of cases [in which] we have been called [on] to decide whether . . . [on] their particular facts they fall within the provisions of the statute, and they afford a valuable basis for arriving at a general conception of its application." *King* v. *Palmer*, 129 Conn. 636, 639–40, 30 A.2d 549 (1943).

*Massolini* v. *Driscoll*, supra, 114 Conn. 546, is one such case, and it featured prominently in the present dispute to help guide the analysis of the commissioner, the board, and the Appellate Court, as well as in the parties' arguments before this court. In *Massolini*, the city of Hartford hired a contractor to provide a team of horses and a driver to collect ashes and rubbish left out by the public for removal. Id., 548. The driver employed by the contractor was fatally injured while tending to the horses' shoes, precipitating a workers' compensation claim. Id., 549. As in the present case, the issue in *Massolini* was whether the municipality was the employee's principal employer under the statute, and, as here, this question hinged on whether the work performed by the employee was a part or process in the city's trade or business. We held that, for a municipal corporation, the term "business" means "the conduct of the usual affairs of the corporation, and such as commonly engage the attention of its officers." Id., 552. We noted that Hartford was authorized to remove ashes and rubbish as part of its police powers; id., 551–52; and held that such work was a "business" of the city within the meaning of the Workers' Compensation Act. Id., 552. Because the driver's work on the horses' shoes was "incidental to and in furtherance of the operations involved in [that] business of [Hartford], a valid claim for compensation [had] been established

against [Hartford]." Id., 553.[6]

We agree with the Appellate Court, the board, and the commissioner that *Massolini* provides useful guidance in the present case. The plaintiff in the present case was employed by one of the city's subcontractors to discharge an obligation imposed by law on the city itself, namely, the maintenance and repair of municipal buildings. As the commissioner found, and as no party disputes, the city had a responsibility to manage, maintain, and repair its public buildings, including its transfer facility, pursuant to § 7-148 (c) (6) (A) (i). See footnote 4 of this opinion. This conclusion is further supported by Cottell's testimony that it was the responsibility of the public facilities department to maintain city-owned buildings. The commissioner reasonably determined that maintenance of the transfer facility, including the repair of the facility's roof, was among "the usual affairs of the corporation, and such as commonly engage the attention of its officers" and, therefore, is a part or process in the city's business. *Massolini* v. *Driscoll*, 114 Conn. 552. Other states with similar "trade or business" language in their principal employer statutes have reached the same conclusion. See *Rodriquez* v. *John Russell Construction*, 16 Kan. App. 2d 269, 275, 826 P.2d 515 (1991) ("[r]oof repair was essential to protect the [public housing complex] and ensure that it remained habitable," and worker injured while doing so was statutory employee of municipality under workers' compensation statute); *Ford* v. *Richmond*, 239 Va. 664, 665, 669, 391 S.E.2d 270 (1990) (worker injured while repairing roof on city reservoir was statutory employee[7] of city under workers' compensation statute).[8]

We do not agree with the dissent's prediction that continuing[9] to give consideration to the legally defined powers and obligations of a city in determining its trade or business would "render a municipality the workers' compensation guarantor of virtually every employee of an independent contractor engaged by the city." As we explain elsewhere in this opinion, other factors, such as the complexity of the work in question; *Battistelli* v. *Connohio, Inc.*, 138 Conn. 646, 649, 88 A.2d 372 (1952); or the scale of the undertaking, as in *Grenier* v. *Grenier*, supra, 138 Conn. 569; see footnote 12 of this opinion; may place work outside of the trade or business of a municipality, even if that work falls generally within the city's legally defined powers and obligations. Importantly, a city may protect itself against the financial loss of a determination that it is the principal employer of an injured worker by taking the simple step of ensuring that any independent contractor it hires carries workers' compensation insurance, as the city is mandated to do by § 31-286a (a). See footnote 5 of this opinion. If a city takes that precaution, and if it is found liable to pay workers' compensation benefits as a principal employer, it may recover any sums that it pays as a result from the independent contractor. See *Sgueglia*

v. *Milne Construction Co.*, supra, 212 Conn. 433–34 (between principal employer and subcontractor, latter is primarily liable); *Johnson* v. *Mortenson*, supra, 110 Conn. 228 (because liability of immediate employers is primary and liability of principal employers is secondary, principal employer may recover sums paid to injured worker from immediate employer).

The defendants contend that roof repair is not a part or process in the city's business because the city did not employ any roofers. Although relevant to the determination of an employer's trade or business, this factor is not dispositive. We have held that, "[i]f the work is of such a character that it ordinarily or appropriately would be performed by the principal employer's own employees in the prosecution of its business, or as an essential part in the maintenance thereof, it is a part or process of his work." *King* v. *Palmer*, supra, 129 Conn. 641. We have made it clear that "no one exclusive test can be set up and that each case must be determined on its own facts . . . ." *Crisanti* v. *Cremo Brewing Co.*, 136 Conn. 529, 532, 72 A.2d 655 (1950). A finding that the work in question ordinarily or appropriately is performed by the principal employer's own employees is *sufficient* to establish principal employer liability; see, e.g., *Kasowitz* v. *Mutual Construction Co.*, 154 Conn. 607, 613–14, 228 A.2d 149 (1967); but it is not a prerequisite to that liability. See *Mancini* v. *Bureau of Public Works*, 167 Conn. 189, 196, 355 A.2d 32 (1974) (observing that "this test is not necessarily conclusive").

*Pacileo* v. *Morganti, Inc.*, 10 Conn. App. 261, 522 A.2d 841 (1987), is instructive on this point. In *Pacileo*, the Appellate Court considered whether the defendant, a general contractor hired to oversee the city of New Haven's city hall and library construction project, was the principal employer of the plaintiff, an ironworker injured on the work site. Id., 262. The Appellate Court noted that "the defendant's business, as the general contractor, was to oversee and implement the construction of the city hall library complex. . . . A necessary and expected part of that construction was the laying of steel rods for the pouring of concrete. Ironworkers generally lay steel rods. Since none of the individuals directly employed by [the defendant was] qualified to perform the job of ironworker . . . the utilization of ironworkers such as the plaintiff was a part or process of the defendant's trade or business." (Internal quotation marks omitted.) Id., 264; see also *Adams* v. *Jodar Blasting, Inc.*, No. 1943, CRB 2-93-12 (January 17, 1996) (home construction business was principal employer of employee of contractor who was hired to blast rock at construction site, even though principal employer did not have any employees qualified to perform such work). Therefore, the defendant general contractor was the employee's principal employer under § 31-291, even though it "did not directly employ any [ironworkers]" or "any . . . employees qualified to perform the job of

[ironworkers]." *Pacileo* v. *Morganti, Inc.*, supra, 263; see also *Kasowitz* v. *Mutual Construction Co.*, supra, 154 Conn. 608–609, 614 (The court held that the defendant general contractor was the primary employer of the plaintiff, who was an employee of a glass company hired to install windows, because the defendant was obligated by contract to "complete . . . construction . . . in all respects, including the glass work. All of this was part of its business. It chose to enter into subcontracts for certain phases of the work, including the glass work, instead of hiring glaziers to do the work at the appropriate time.").

The analogy to a general contractor is apt.[10] Just as the defendant's business in *Pacileo* was to "oversee and implement" a construction project; *Pacileo* v. *Morganti, Inc.*, supra, 10 Conn. App. 264; in the present case, the city's business includes, among other things, the maintenance and repair of its buildings and facilities, including the transfer facility. See General Statutes § 7-148 (c) (6) (A) (i). We do not say that all such repairs, regardless of their complexity and the level of specialization required, automatically must be considered to be part of the business of a large municipality such as Bridgeport. Indeed, we have explained that the complexity of the work in question is a relevant factor for determining principal employer liability under § 31-291. See *Battistelli* v. *Connohio, Inc.*, supra, 138 Conn. 649 ("it is obvious that the intricate character of the job and the special skill required put it well outside of the capabilities of the defendants' ordinary employees"). On the present record, however, we have no reason to disagree with the conclusion of the commissioner that roof repair is a "necessary and expected part" of the routine building maintenance of the city's transfer facility. *Pacileo* v. *Morganti, Inc.*, supra, 264. It does not appear that the roof repairs at issue were so complex or demanded such specialized skills that they fell outside of the business of the city, which employs a variety of tradespeople—including electricians, carpenters, plumbers, painters, and masons—but which elected not to employ its own roofers for financial reasons.[11] Because the city chose not to employ roofers of its own, it was required to contract for roofing services, making the utilization of roofers, such as the plaintiff, a part or process in the city's business of maintaining and repairing the transfer facility.

Predicating principal employer liability on the actual employment of workers who perform the type of work at issue also would be inconsistent with the remedial purpose of § 31-291. As we previously have stated, "the purpose of the principal employer provision in § 31-291 is to afford full protection to work[ers], by preventing the possibility of defeating the [Workers' Compensation Act] by hiring irresponsible contractors or subcontractors to carry on a part of the [principal] employer's work." (Internal quotation marks omitted.) *Gonzalez*

v. *O & G Industries, Inc.*, 322 Conn. 291, 307, 140 A.3d 950 (2016). The statute "protect[s] employees of minor contractors against the possible irresponsibility of their immediate employers. . . . Otherwise, [§ 31-291], and, indeed, the whole policy of the [Workers'] Compensation Act, might be evaded by the device of the owner parceling out the work of construction among a number of separate [uninsured] contractors . . . ." (Internal quotation marks omitted.) *Johnson* v. *Mortenson*, supra, 110 Conn. 226. The defendants' interpretation of the statute would allow employers to do precisely what the statute was enacted to prohibit—avoid liability under the Workers' Compensation Act by choosing to hire contractors rather than employees to perform certain tasks.

The defendants contend that their position finds support in *Fox* v. *Fafnir Bearing Co.*, supra, 107 Conn. 189, the holding of which they say implies that the "repair or alteration" of a building is not a part or process in an employer's trade or business. The defendants construe our holding in *Fox* too broadly. In that case, the plaintiff, Richard Fox, was an employee of a window washing company that the defendant, Fafnir Bearing Company (Fafnir), had hired to wash the windows in its factory. Id., 190. Fafnir was "in the business of manufacturing ball bearings," but "it was necessary to have the windows washed, as a clean and attractive condition of the factory was an advertising asset of the corporation." Id., 191. On appeal, Fafnir claimed that it was not Fox' principal employer because "the washing of windows by [Fox] was not 'a part or process in [its] trade or business . . . .' " Id., 192. We disagreed, reasoning that "[a]ny work which was an essential part of the maintenance and operation of its factory was a part of its 'trade or business,' though not a process in the actual work of manufacturing ball bearings. . . . [Fox'] work of window-washing was work which had to do with the maintenance of the factory buildings in good condition for the manufacturing processes there conducted, and which could fairly be said to be essential for that purpose—work similar in character to that of scrubbing the floors, cleaning the offices and ordinary janitor work. Such work is customarily done by regular employees in the daily routine of their duties in the factory. It is clearly distinguishable from work done in connection with the repair or alteration of the factory buildings. It is a part of the work of keeping the employer's factory in running condition, and therefore a part of its 'trade or business' though not directly connected with any manufacturing process. To limit the application of [the principal employer statute] to work done in the actual process of manufacture would be to adopt a construction not required or permitted by the language of the [Workers' Compensation] Act, and entirely at variance with our settled policy of construing the [Workers'] Compensation Act broadly in order to effec-

tuate its purpose." Id., 195–96.

Although the thrust of the analysis in *Fox* supports the conclusion we reach here, the defendants contend that the language distinguishing ordinary maintenance work, such as washing windows, from "work done in connection with the repair or alteration of the factory buildings"; id., 195; requires a different outcome in the present case because it involves a roof repair. The defendants' position, however, overlooks the most fundamental observation made in *Fox*, which is that "[n]o general rule [for determining the scope of the employer's trade or business for purposes of principal employer liability] is deducible from the authorities, and it is often a matter of extreme difficulty to decide whether the work in a given case falls with the designation of the statute. It is in each case largely a question of degree and of fact . . . ." Id., 194. A categorical distinction between maintenance and repair is not helpful in this context, and we do not read *Fox* to establish such a distinction as a doctrinal matter. The determination in any particular case as to whether the nature and extent of the work being performed by the plaintiff should be deemed a part of the defendant's business operations or outside of those business operations will depend on the specific facts of the case viewed in light of the factors previously discussed in this opinion. In the present case, the commissioner reasonably concluded that the repair of the transfer facility's roof was a part or process in the city's business on the basis of the evidence concerning the city's business operations, its statutory responsibilities, and the nature and scope of the maintenance and repair work ordinarily performed by city employees.[12]

The defendants contend, in a similar vein, that roof repair is not a part or process in the city's trade or business because the city did not supply the plaintiff with tools or materials or oversee the plaintiff's work. This argument suffers from the same defect as the previous one. Like the hiring of employees, the source of the tools or materials used for the work, although relevant to the principal employer inquiry, is not a dispositive consideration. We have upheld findings of principal employer liability without making reference to which party supplied tools and materials or oversaw the work in question. See *Mancini* v. *Bureau of Public Works*, supra, 167 Conn. 193, 196–97 (finding no error in trial court's directions to jury on part or process element without making reference to whether defendant supplied tools or materials or directly oversaw work); *Fox* v. *Fafnir Bearing Co.*, supra, 107 Conn. 194–96 (upholding commissioner's conclusion that defendant was principal employer without making reference to whether defendant supplied tools or materials or directly oversaw work); see also *Hebert* v. *RWA, Inc.*, 48 Conn. App. 449, 454–55, 709 A.2d 1149 (upholding commissioner's finding that work was part or process in trade or busi-

ness of principal employer without making reference to whether principal employer supplied tools and materials or directly oversaw work), cert. denied, 246 Conn. 901, 717 A.2d 239 (1998); *Pacileo* v. *Morganti, Inc.*, supra, 10 Conn. App. 264–65 (no genuine issue of material fact as to whether defendant was principal employer, although no reference was made to whether defendant supplied tools or materials or directly oversaw work).[13]

In the alternative, the defendants ask us to overrule *Massolini* insofar as it applies principal employer liability to municipalities. The defendants argue that the definition of "business" in *Massolini* is outdated and cite a 2003 dictionary to support their claim that the term "business" means a "commercial or mercantile activity engaged in as a means of livelihood: trade, line," a "commercial or sometimes an industrial enterprise," or "dealings or transactions [especially] of an economic nature . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 167. We decline to overrule *Massolini* for two reasons. First, "[w]hen a term is not defined in a statute, we begin with the assumption that the legislature intended the word to carry its ordinary meaning, as evidenced in dictionaries in print *at the time the statute was enacted*." (Emphasis added.) *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 176, 162 A.3d 706 (2017); see also *Sandifer* v. *United States Steel Corp.*, 571 U.S. 220, 227, 134 S. Ct. 870, 187 L. Ed. 2d 729 (2014) ("[i]t is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, *contemporary*, common meaning" (emphasis added; internal quotation marks omitted)).[14] We attribute no persuasive value to the defendants' preferred definition of business, taken from a dictionary published ninety years after the enactment of the principal employer statute.

Second, our adherence to this court's holding in *Massolini* gains additional force from the doctrine of stare decisis. "This court has repeatedly acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law. . . . The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Citation omitted; internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 519, 949 A.2d 1092 (2008). "Moreover, [i]n evaluating the force of stare decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do." (Internal quotation

marks omitted.) Id., 519–20. The Workers' Compensation Act includes municipalities within the definition of employer; General Statutes § 31-275 (10) (" '[e]mployer' means any person, corporation, limited liability company, firm, partnership, voluntary association, joint stock association, the state and *any public corporation within the state using the services of one or more employees for pay*" (emphasis added)); and the term "principal employer" has been construed to encompass municipalities for more than eighty years.[15] The holding and implications of *Massolini* and its progeny have by now become embedded as part of our workers' compensation law, and we are unwilling to overturn established doctrine and upset settled expectations under these circumstances.

The defendants seek to strengthen their argument in favor of doctrinal modification by asserting that the 1959 expansion of the fund has "displaced" *Massolini* because the availability of the fund has eliminated the need to hold municipalities liable as principal employers. The defendants point out that the fund did not exist when *Massolini* was decided and suggest that *Massolini* would have been decided differently if the fund had existed at the time. They hypothesize that, because the existence of the fund means that the injured worker is no longer left uncompensated in these circumstances—that is, the fund would be obligated to pay the plaintiff's compensation award if the city is not found to be the plaintiff's principal employer—it is no longer necessary to apply the principal employer statute to the city under *Massolini*. We are not persuaded.

To begin with, nothing in the language of the statute establishing the fund suggests a legislative intent to abrogate *Massolini* or to alter the standards of principal employer liability. The legislature created the fund in 1945 to encourage employers to hire employees with preexisting disabilities or injuries. See Public Acts 1945, No. 188; *Cece* v. *Felix Industries, Inc.*, 248 Conn. 457, 462–63, 728 A.2d 505 (1999). In 1959, the legislature expanded the role of the fund by requiring it to pay an award of compensation whenever an injured employee's employer or the employer's insurer did not pay. See Public Acts 1959, No. 580, § 13. Today, this provision is codified at § 31-355.[16] Section 31-355 is silent on the matter of principal employer liability. The defendants have failed to identify any ambiguity in the relevant statutes or statutory scheme that would prompt us to consider their argument for modification; nor have they provided any evidence suggesting that the legislature contemplated making any change to the meaning or scope of principal employer liability or otherwise relieving municipalities of principal employer liability through the fund.

The defendants' argument also misapprehends the role of the fund in our workers' compensation scheme.

A primary purpose of the fund is to act as a backstop, ensuring that injured workers receive compensation when the employer has "failed, neglected, refused, or is unable to pay . . . ." General Statutes § 31-155 (b). The fund is a payer of last resort; its existence does not relieve employers or principal employers of their obligations to pay under the Workers' Compensation Act. See General Statutes § 31-355 (c) ("[t]he employer and the insurer, if any, shall be liable to the state for any payments made out of the fund").

Finally, the defendants argue that the commissioner violated § 31-286a (c) by finding the city liable as the plaintiff's principal employer "solely because" it had not met its statutory obligation under § 31-286a (a) to ensure that its contractors were in compliance with the workers' compensation insurance requirements. We declined to grant certification on this issue and do not address the claim. See, e.g., *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 195 n.2, 931 A.2d 916 (2007).

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, McDONALD and VERTE-FEUILLE, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, Kahn and Ecker. Thereafter, Justice Vertefeuille and Judge Elgo were added to the panel and have read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

** August 13, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 31-291 provides in relevant part: "When any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation under this chapter to the same extent as if the work were done without the intervention of such contractor or subcontractor. . . ."

[2] The defendants in the matter before the Workers' Compensation Commission were (1) the city, (2) the city's insurer, PMA Insurance Company, (3) the city's contractor, All Roofs by Dominic, and (4) Howard Adams d/b/a Howie's Roofing, the city's subcontractor and the employer of the plaintiff, Christopher Barker. After the Workers' Compensation Commissioner determined that the plaintiff's claim was compensable under the Workers' Compensation Act and that the plaintiff's employer was uninsured, the Second Injury Fund (fund) became obligated to compensate the plaintiff for his injuries under General Statutes § 31-355 (h). See footnote 3 of this opinion.

The plaintiff did not participate in the proceedings before the Compensation Review Board or the Appellate Court, but the fund participated in those proceedings as the appellee to defend the decision of the Workers' Compensation Commissioner that the city, rather than the fund, was liable for the payment of the plaintiff's workers' compensation benefits. The plaintiff likewise is not a party to the present appeal, and the fund is the appellee. All Roofs by Dominic did not seek review of the decision of the Workers' Compensation Commissioner and is not a party to the present appeal. All references to the defendants hereinafter are to the city and its insurer, PMA Insurance Company.

[3] General Statutes § 31-355 provides in relevant part: "(b) When an award of compensation has been made under the provisions of this chapter against an employer who failed, neglected, refused or is unable to pay any type of benefit coming due as a consequence of such award or any adjustment in

compensation required by this chapter, and whose insurer failed, neglected, refused or is unable to pay the compensation, such compensation shall be paid from the Second Injury Fund. . . .

* * *

"(h) When a finding and award of compensation [have] been made against an uninsured employer who fails to pay it, that compensation shall be paid from the Second Injury Fund . . . ."

[4] General Statutes § 7-148 (c) (6) (A) (i) provides in relevant part: "Any municipality shall have the power to do any of the following . . . [e]stablish, lay out, construct, reconstruct, alter, maintain, repair, control and operate . . . garbage and refuse disposal facilities . . . and any and all buildings or facilities necessary or convenient for carrying on the government of the municipality . . . ."

[5] General Statutes § 31-286a provides in relevant part: "(a) . . . [N]either the state, or its agents, nor any political subdivision of the state, or its agents, may enter into any contract on or after October 1, 1986, for the construction, remodeling, refinishing, refurbishing, rehabilitation, alteration or repair of any public works project before receiving from each of the other parties to such contract [inter alia] sufficient evidence of compliance with the workers' compensation insurance and self-insurance requirements of subsection (b) of section 31-284 . . . .

* * *

"(c) This section shall not be construed to create any liability on the part of the state or any political subdivision thereof to pay workers' compensation benefits or to indemnify the Second Injury Fund, any employer or any insurer who pays workers' compensation benefits. . . ."

[6] The dissent "find[s] most significant the fact that the driver in *Massolini* was working alongside Hartford's own employees at the time of his fatal injury." We respectfully disagree with this reading of *Massolini*. The factor identified by the dissent was not mentioned by the court in its application of the principal employer statute to the facts of that case. The primary factor determining the outcome in *Massolini* was that "Hartford was engaged in the removal of ashes and refuse in the exercise of its police powers"; *Massolini* v. *Driscoll*, supra, 114 Conn. 551–52; thus making "the disposal of ashes and rubbish . . . a 'business' in which . . . Hartford was engaged at the time of [the] accident . . . ." Id., 553.

[7] The terms "statutory employee" and "statutory employer" often are used in other states to refer to what our Workers' Compensation Act calls the "principal employer" relationship. See, e.g., Va. Code Ann. § 65.2-302 (2017).

[8] The dissent notes that the Virginia courts' approach, which looks only to the "duties, obligations, and responsibilities imposed [on governmental entities] by statute, regulation, or other means" for purposes of determining principal employer status; (internal quotation marks omitted) footnote 6 of the dissenting opinion, quoting *Ford* v. *Richmond*, supra, 239 Va. 667; was criticized as "out of step" with other state courts in a two-sentence concurring opinion of the District of Columbia Circuit Court of Appeals. *Best* v. *Washington Metropolitan Area Transit Authority*, 822 F.2d 1198, 1202 (D.C. Cir.1987) (Mikva, J., concurring). Judge Mikva provided no analysis to accompany that criticism, but it appears that he would prefer an approach that determines principal employer status on the basis of whether the employer normally carries on a given activity through its own employees rather than through independent contractors. See id., 1200–1201 (describing "normal work" test rejected by Virginia Supreme Court in context of governmental entities (internal quotation marks omitted)). We, of course, agree with the dissent that an approach to determining principal employer status for governmental entities that looks *only* to their legal duties and obligations would be overly restrictive. But this court has long considered the powers and duties of public entities as a relevant factor in determining principal employer status. See footnote 9 of this opinion. The question of whether an employer ordinarily would perform certain work through its own employees rather than through contractors is likewise relevant to the principal employer inquiry; it simply is "not necessarily conclusive." *Mancini* v. *Bureau of Public Works*, 167 Conn. 189, 196, 355 A.2d 32 (1974); accord *Fox* v. *Fafnir Bearing Co.*, supra, 107 Conn. 195. Our approach is in accordance with the principle that " 'no one exclusive test can be set up' " for determining principal employer status. *Battistelli* v. *Connohio, Inc.*, 138 Conn. 646, 652, 88 A.2d 372 (1952) (*Inglis, J.*, concurring), quoting *Crisanti* v. *Cremo Brewing Co.*, 136 Conn. 529, 532, 72 A.2d 655 (1950).

[9] The dissent is correct that the legally defined powers and obligations of a municipality ordinarily should not be dispositive in determining its

"trade or business," but the nature and scope of those legally prescribed duties are relevant to the inquiry, and looking to those legal prescriptions for guidance is consistent with our decisions regarding principal employer liability for municipal corporations. For example, in *Massolini*, it was significant that Hartford was collecting rubbish and ashes pursuant to its police powers. See *Massolini* v. *Driscoll*, supra, 114 Conn. 551–52; see also *Mancini* v. *Bureau of Public Works*, 167 Conn. 189, 196, 355 A.2d 32 (1974) (it was significant that public entity's charter authorized it to engage in work that plaintiffs had been performing when they were injured). Courts in states with similar "trade or business" language in their principal employer statutes have often looked to the powers, duties, and obligations of municipal corporations to determine the "business" of the corporation. See *Wright* v. *Honolulu*, 41 Haw. 603, 606 (1957) (tunnel construction was "properly a part of [the municipality's] business" under workers' compensation law when municipality was authorized by law to finance and fund project); *Klohn* v. *Louisiana Power & Light*, 406 So. 2d 577, 580–82 (La. 1981) (when city bond resolution required city to retain ownership of power plant system, city was in business of providing electric service, notwithstanding operating agreement that transferred all operations of plant to contractor); *Roberts* v. *Alexandria*, 246 Va. 17, 20, 431 S.E.2d 275 (1993) ("because the [c]ity is authorized and empowered [by state statute and the city charter] to operate the jail, and to provide medical services there, the delivery of those medical services are within the [c]ity's trade, business, or occupation"); see also *Leigh* v. *National Aeronautics & Space Administration*, 860 F.2d 652, 653 (5th Cir. 1988) (when federal statute authorized agency to develop, construct, test, and operate aeronautical and space vehicles, worker injured while performing test on external tank of space shuttle "was performing work that was part of the United States' business" for purposes of state workers' compensation law).

[10] The dissent argues that *Pacileo* is distinguishable on the grounds that "[a] general construction contractor, who voluntarily undertakes the organization of a major construction project as a commercial venture, is situated differently from a municipality that has broad statutory powers in a variety of areas . . . ." Footnote 7 of the dissenting opinion. We agree that a municipality's business activity will generally be broader than that of a commercial enterprise focused on providing a particular product or service, but we do not see how this should be a *limiting* consideration when determining a municipality's trade or business. A municipality like Bridgeport has been conferred broad operational responsibilities. With those responsibilities come correspondingly broad obligations. In this regard, we repeat our observation that the legislature has seen fit to treat public and private employers without distinction or differentiation for purposes of determining principal employer status. We respectfully disagree that a consideration deemed relevant to determining the principal employer status of a private business in *Pacileo* should be excluded from consideration as part of the same inquiry for a public employer.

[11] The range of skilled tradespeople employed by the city reveals the flaw in the city's argument that it cannot be the plaintiff's principal employer because it is not in the business of roofing. The city also is not "in the business" of masonry, plumbing, carpentry, painting, or electrical work, yet it employs individuals skilled in each of these trades because the business of the city requires it to manage, maintain, and repair a wide range of public facilities, including its transfer facility.

[12] The defendants also point to our decision in *Grenier* v. *Grenier*, supra, 138 Conn. 569, in support of their argument that roof repairs cannot be a part or process in the city's business. In *Grenier*, the plaintiff was injured while working for a contractor hired to install weatherproofing material on a new roof being constructed by another contractor as part of a major renovation of a three-story building owned by a car dealership. Id., 570. We upheld the commissioner's finding that the plaintiff's work was not a part or process in the trade or business of the dealership. Id., 572. We reject the defendants' contention that there is "no distinction" between *Grenier* and the present case. To the contrary, we believe that the commissioner in the present case was entitled to see a substantial difference between the major capital improvement undertaken by the automobile dealership in *Grenier* and the repair of an existing roof on the city's transfer station at issue here.

[13] In *Mancini* and *Hebert*, the court made reference to supervision of the work site by the principal employer when discussing control of the premises. See *Mancini* v. *Bureau of Public Works*, supra, 167 Conn. 200; *Hebert* v. *RWA, Inc.*, supra, 48 Conn. App. 454. Control of the premises is a separate

element of the principal employer analysis, distinct from the trade or business inquiry. See *Crane* v. *Peach Bros.*, supra, 106 Conn. 113 ("[t]o render a principal employer liable, it is clear [that] this statute requires (1) that the relation of principal employer and contractor must exist in work wholly or in part for the former, (2) that the work must be in, on or about premises controlled by the principal employer, and (3) that the work be a part or process in the trade or business of the principal employer").

[14] In doing so, we also acknowledge the wisdom found in Judge Learned Hand's cautionary note that a dictionary will not always provide the very best resource for determining the meaning of a word at any particular time. See *Cabell* v. *Markham*, 148 F.2d 737, 739 (2d Cir.) ("it is one of the surest [indices] of a mature and developed jurisprudence not to make a fortress out of the dictionary"), aff'd, 324 U.S. 404, 66 S. Ct. 193, 90 L. Ed. 2d (1945); see also *United States* v. *Costello*, 666 F.3d 1040, 1043–44 (7th Cir. 2012).

[15] "Public corporations have always been included within the scope of our [Workers' Compensation Act], no doubt because there is no substantial reason why their employees should be treated differently than employees in private industry. . . . [P]ublic corporation as used in § 31-275 (10) . . . signifies corporations organized for a public purpose such as municipalities and counties. . . . [T]his interpretation is consistent with the legislative history . . . . During the committee hearings on the bill that became chapter 138 of the 1913 Public Acts, [P]rofessor Willard C. Fisher, an economist at Wesleyan University who had been engaged by the standing committees on judiciary and labor to assist in drafting the act, remarked that the law ought to be as wide as possible in its scope; there ought to be no employment left out that can practically be included. . . . Fisher stated further that there is no good reason for excluding employment of public corporations . . . truly public corporations, the state, the city and the like." (Citations omitted; internal quotation marks omitted.) *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 431–32, 994 A.2d 1265 (2010).

[16] See footnote 3 of this opinion.